

<u>Translation</u>

October <u>20</u>, 2000

Foremost International Trading Co. Inc

("Party A")

Tangshan Huida Ceramic Group Co., Ltd

("Party B")

# Cooperation Agreement

This agreement is set forth on October 20, 2000 by and between the following parties in Shenzhen Special Economic Zone, Guangdong Province, People's Republic of China.

1. Foremost International Trading Co. Inc. ("Party A") is a limited company duly registered and incorporated and validly existing in the state of New Jersey in the United States of America.

    Representative: CHEN Liangzu (Joe Chen)

    Address: 906 MURRAY ROAD, EAST HANOVER, NEW JERSEY 07936, USA.

2. Tangshan Huida Ceramic Group Co. Ltd. ("Party B") is a limited company duly registered and incorporated and validly existing in Fengnan City, Hebei Province, People's Republic of China.

    Legal Representative: WANG Huiwen

    Address: Huanggezhuang Village, Fengnan City, Hebei Province.

**PREFACE**

A. Party A is a ceramic bathroom products distributor, which has successfully developed a sizeable market in the United States and Canada;

B. Party B is a specialized ceramic bathroom products manufacturer and distributor;

C. In order to develop the U.S. and Canadian markets for ceramic bathroom products in the long term, both Parties intend to cooperate comprehensively in the manufacturing and distribution of products suitable for the U.S. and Canadian markets, so as to generate greater commercial profits.

Therefore, upon negotiation on an equal basis, Party A and Party B hereby enter into the following agreement ("this Agreement") for both parties to abide by:

1. **Interpretation**

    1.1    Unless referred to otherwise, the contents, preface, and attachments of this Agreement, contain terms that are defined as follows:

    "Type A Products" refers to products developed and designed by Party A and manufactured by Party B with the entrustment of Party A and with Party A providing the complete set of design drawings/samples to Party B.

"Type B Products" refers to products based on the original products of Party B, for which Party A provides modified drawings/samples based on the market demands in the U.S. and Canada and entrusts Party B to manufacture.

"Type C Products" refers to products designed and manufactured by Party B.

"Third Party" refers to any company or individual other than Party A or Party B to this Agreement.

"Company" refers to any form of company, corporation, financial institution, joint venture, partnership, or other economic organization established in China or other regions.

"Individual" refers to any person, company, any form of legal person association, non-organizational legal person or non-legal person, trust, or any other association, state or its branch or any government or its relevant agencies.

"Original Products" refers to products that have completed design and sample tests and have been commercially produced by Party A before this Agreement takes effect.

"Development of New Products" refers to products for which Party A or Party B will complete design and sample tests, and may be commercially produced after this Agreement takes effect.

"Design Drawings" refers to the whole set of materials including drawings, images, and sample products necessary for the production of a particular product.

"Modified Drawings" refers to the whole set of materials including drawings, images, and sample products necessary for the modification of the original products based on the original products and market demands.

"Samples" refers to any finished product based on design drawings or modified drawings and to be used for sampling.

"Product Codes" refers to codes created and mutually agreed upon by Party A and Party B and based on the difference in each product's model and specification to indicate product models and specifications, in order to facilitate communication between the parties and the provision of design drawings/modified drawings, samples, placing orders, manufacturing and sales.

"Major Modification" refers to any necessary new molds which cannot be modified from the existing molds due to the appearance, design, sizing and specifications of the product design, and must be produced again.

2. **The table of contents and the title of each clause contained in this Agreement are for convenience only and have no legal effect, and shall not affect the interpretation of any clause in this Agreement.**

3. **Molds and Samples**

    3.1  Expenditure for mold development: Expenditure incurred for new molds or major modifications to the molds based on Design Drawings/Modified Drawings, shall be confirmed by Party A and Party B based on the cost of the molds. Upon request by Party B, the expenditure shall be paid for by Party A.

    3.2  Deduction of mold expenditure: If Party A does not make major modifications during Party B's sample testing and after Party B's delivery of sample products, and after Party A orders more than 3,000 sets (including 3,000 sets) of such product, Party A is not required to pay for the mold expenditure. In the event that Party A has already paid for the mold expenditure, Party B shall refund it or subtract the mold expenditure from the payable amount. If the quantity ordered by Party A does not reach 3,000 sets, Party B shall not refund the mold expenditure.

    3.3  Delivery of Samples: Based on the actual business need of Party A, Party B shall deliver Samples by the date agreed upon by both parties.

4. **Protection for Industrial Proprietary Rights and Trade Secrets**

    4.1  The industrial proprietary rights and trade secrets such as know-how resulting from the design, sample testing and production of Type A and Type B Products shall belong to Party A. Party B shall not use such industrial proprietary rights or trade secrets, license others to use them, or disclose them to others without Party A's authorization.

    4.2  The industrial proprietary rights and trade secrets such as know-how resulting from Type C Products shall belong to Party B. Party A shall not use such industrial proprietary rights or trade secrets, license others to use them, or disclose them to others without Party B's authorization.

    4.3  In case of a violation of clauses 4.1 or 4.2, the breaching party shall assume all legal responsibilities and pay compensation for all losses and damages suffered by the other party.

    4.4  As to the industrial proprietary rights and trade secrets of special products, the Parties shall negotiate separately.

5. **Trademarks**

    Based on sales needs, Party A will designate a particular trademark for the relevant products to be manufactured by Party B, and will specify it in the specific purchase orders/purchase agreements. The quantity of a single product covered by each trademark to be ordered by Party A shall reach 5,000 units within a year. Party A shall be responsible for all disputes and liabilities arising in connection with the trademarks.

6. **Certification**

    To meet the demands of the U.S. and Canadian markets and to better develop these markets, certifications for manufacturers and products shall be obtained within a time frame mutually agreed upon by both Parties. If the relevant certifications are not obtained, resulting in the failure to meet product sales targets, the responsible party shall be held responsible.

7. **Production and Sales**

    7.1  Type A and Type B Products: Party A will order from Party B based on market demand and will entrust Party B to manufacture and purchase such products from Party B;

    Without Party A's authorization, Party B shall not manufacture, sell or authorize any third party to sell, or accept any third party's request to manufacture such products.

    7.2  Type C Products: Party A will order and purchase from Party B based on market demand. Party A shall be the exclusive distributor of Party B's Type C Products in the U.S. and Canadian markets (exclusivity). Party B shall not sell or authorize any third party to sell Type C Products in the U.S. or Canadian markets.

8. **Special Agreements**

    8.1  After this Agreement takes effect, Party B shall not enter into any agreement with any third party to authorize the third party to sell Type A, Type B, or Type C Products, which are defined in this Agreement, in the U.S. and Canadian markets.

    8.2  Party A guarantees that, after this Agreement takes effect, it will place purchase orders with Party B in the total sum of USD$3,000,000 or more within one year starting from the delivery date. Once this purchase sum is met, Party A's exclusive distribution right in the U.S. and Canadian markets shall extend automatically. The purchase sum for the following year shall be negotiated by the Parties separately. If the purchase sum is not met, Party A and Party B shall negotiate again based on the market conditions.

    8.3  This agreement shall be annulled if Party A fails to make any purchase within 8 months.

**9.**  **<u>Purchasing</u>**

    9.1  Product price and payment

Party A shall request price quotes from Party B by Product Codes and Party B shall provide the quotes. The prices shall be negotiated and determined by Parties A and Party B. Product price and payment will be stipulated by Party A and Party B in the purchase orders or purchase agreements.

    9.2  Product quality

Products manufactured by Party B shall satisfy the requirements of ANSI (U.S.) and CSA (Canada), which shall be stipulated in Party A's purchase orders or purchase agreements.

In the event that products manufactured by Party B do not meet ANSI and CSA requirements, Party B shall pay compensation based on the actual situation and amount in accordance with the certification issued and the quantity verified by a notary agency acceptable to both Parties.

Party A shall lodge a complaint to Party B as soon as it discovers any quality issues, and Party B shall respond within 30 days after receipt of the complaint letter; otherwise, the complaint shall be deemed accepted by Party B. Supporting documents will be discussed separately by the Parties.

    9.3  Product quantity and damages

Party B is responsible for using appropriate packaging materials and adopting proper loading methods to minimize shipping damages. When damage occurs, damage within the 5% deductible will not be covered by insurance and will be resolved by the Parties. When damage exceeds the 5% deductible, Party A will file a claim with the insurance company. Any shortage without prior notification to and approval by Party A shall be replenished by Party B, upon presentation of valid proof provided by Party A. Party B shall also reimburse Party A or its customers for any shipping cost, tax, and loss incurred as a result of handling the relevant matter.

    9.4  Delivery date

Party A shall place purchase orders or purchase agreement based on Party B's production capacity. The delivery date will be determined by both Parties, and Party B guarantees that it will deliver products on time. If delivery is delayed for 14 days, Party A is entitled to impose a penalty on Party B amounting to 5‰ of the total amount of the order for each day of delay. If delivery is delayed for 21 days, in additional to the penalty paid by Party B to Party A, Party A is entitled to unilaterally terminate the purchase order or purchase agreement. In the event of delay caused by *force majeure*, Party B shall notify Party A within 3 days after the *force majeure* event occurs, and negotiate an extension of the delivery date.

Upon completion of production by Party B as scheduled, Party A shall perform under the contract in accordance with the schedule and the quantity as agreed. If Party A wishes to reduce the quantity of product or postpone the delivery date, it shall give Party B 2 months' advance notice.

9.5   Purchase order and purchase agreement

Party A will order from Party B based on the market situation in the U.S. and Canada, and Party B will confirm the order, or Party A and Party B will enter into a purchase agreement. Party B will be responsible for production under purchase orders or purchase agreements.

**10.  Documents, Delivery, and Contacts**

10.1 Party A and Party B agree that during the performance of this Agreement, all documents shall be in written form, including letters, faxes, and emails.

10.2 Parties A and B agree that during the performance of this Agreement, all documents shall be delivered to the following addresses:

Party A: Taipei Office, Foremost International Trading Co. Inc.

Address: No. 39-2, Section 1, Chang An East Road, Taipei Phone: 886-2-2537 1374
Fax: 886-2-2568 3874
Email: michaelc@mail.fittpo.com.tw

Party B: Tangshan Huida Ceramic Group Co. Ltd.

Address: Huanggezhuang Village, Fengnan City, Hebei Province

>Phone: +86-315 8522541 8523618
>
>Fax: +86-315 8522827
>
>Email: huida@public.tsptt he.cn

10.3 Party A and Party B agree that during the performance of this Agreement, the Parties respectively designate Mr./Ms. CHEN Ping and HE Kelan as contact persons for Party A; and Mr./Ms. WANG Yanqing and XING Jinrong as contact persons for Party B.

**11. Entirety**

This Agreement, as well as the Design Drawings, Modified Drawings, purchase orders and purchase agreements and other documents created during the performance of this Agreement, shall all form an integral part of this Agreement and have equal force.

**12. Governing Law**

The formation, interpretation, effectiveness and performance of this Agreement, as well as the resolution of disputes arising under this Agreement, shall all be governed by the laws of the People's Republic of China.

**13. Dispute Resolution**

Any dispute between Party A and Party B during the performance of this Agreement shall be resolved through negotiation and, if it cannot be resolved through negotiation, both Parties agree to submit the dispute to the China International Economic and Trade Arbitration Commission, Shenzhen Branch, for arbitration.

**14. Amendment and Termination**

Unless mutually agreed by both Parties or otherwise provided by law, this Agreement shall not be amended or terminated unilaterally.

**15. Effectiveness**

This Agreement shall take effect upon execution by both parties.

**16. Validity**

This Agreement has been executed in four (4) copies, and each party shall keep two (2) copies, all of which shall be equally valid and enforceable.

**Foremost International Trading Co. Inc.**

Representative: CHEN Liangzu, Joe Chen [Signature]

October 20, 2000

**Tangshan Huida Ceramic Group Co. Ltd.**

Representative: WANG Yanqing [Signature]

October 20, 2000

## Certification of Accuracy

I, Lan Sung, hereby attest that I am a court interpreter certified by the Judicial Council of California for English and Mandarin (I.D. #367368), that I have translated document "附件1：20001020-Agreement", and that to the best of my knowledge, ability, and belief "Translation_EN" is a true, accurate, and complete translation of its original Chinese document provided to me.

*Lan Sung*
_____
SIGNATURE

6/19/2023
_____
DATE

Certification credentials may be verified online at https://www.courts.ca.gov/35273.htm.

2000 年 10 月 20 日

美商富凯股份有限公司
("甲方")

唐山惠达陶瓷（集团）股份有限公司
("乙方")

## 合作协议书

本协议书于 2000 年 10 月 20 日由以下双方在中华人民共和国广东省深圳经济特区订立。

(1) 美商富凯股份有限公司
（Foremost International Trading Co. Inc）　　　（"甲方"）
系一家在美利坚合众国新泽西州注册成立的，并合法有效存续的股份有限公司。
代表人：陈亮祖(Joe Chen)
住　　所：906 MURRAY ROAD, EAST HANOVER, NEW JERSEY. 07936, USA

(2) 唐山惠达陶瓷（集团）股份有限公司
（TANGSHAN HUIDA CERAMIC GROUP CO.LTD）　（"乙方"）
系一家在中华人民共和国河北省丰南市注册成立的，并合法有效存续的股份有限公司。
法定代表人：王惠文
住　　所：河北省丰南市黄各庄镇

绪　　言

(A) 甲方为一家已成功开拓美国、加拿大陶瓷洁具制品市场之销售商；
(B) 乙方为一家专业化陶瓷洁具制品生产与销售商。
(C) 双方为长期地开拓美国、加拿大陶瓷洁具制品市场，拟全面合作，生产、销售适合美国、加拿大市场的产品，以获取更大的商业利益。

故此，甲、乙双方经平等协商，特订立如下合作协议（"本协议"），以资共同遵守：

1、释　义

1.1 在本协议内文、绪言及附件中，除非文中另有所指，否则下列词语有以下涵义：

(合作协议书　2000 年 10 月 19 日)　　　　　　1

| | |
|---|---|
| "A 类产品" | 指由甲方自行开发设计，并向乙方提供全套设计图纸/样品，委托乙方生产之产品。 |
| "B 类产品" | 指在乙方原有产品基础之上，甲方根据美国、加拿大市场要求，提供修改图纸/样品，委托乙方生产之产品。 |
| "C 类产品" | 指乙方自行设计，并自行生产之产品。 |
| "第 三 方" | 指除本协议甲方、乙方外的任何一间公司或人士。 |
| "公　　司" | 指在中国或任何其他地方成立的任何形式的公司、企业、金融机构、合资、合伙及其他经济组织。 |
| "人　　士" | 指个人、公司、任何其他形式的法人团体或非团体法人或非法人、信托或任何团体、国家或其分支部门或任何政府或有关机关。 |
| "原有产品" | 指本协议生效前，甲方已经完成全套设计、样品试制并已进行商业生产之产品。 |
| "新产品开发" | 指本协议生效后，甲方或乙方完成全套设计、样品试制并可以进行商业生产之产品。 |
| "设计图纸" | 指为生产某项产品而必须完成的包括制图、影像、实品的全套资料。 |
| "修改图纸" | 指在原有产品基础上，根据市场需求，对原有产品进行修改所必须完成的包括制图、影像、实品的全套资料。 |
| "样　　品" | 指依照设计图纸/修改图纸，而已经完成的用于样板之产品。 |
| "产品代码" | 指双方根据每种产品的型号、规格之不同，为便于双方交流、提供设计图纸/修改图纸、样品、订货、生产、销售之便利，编制的甲、乙双方认可的产品型号、规格之代码。 |
| "重大修改" | 指按照产品设计的外观、造型、尺寸规格，现有模型无法修改，而应重新制作新的模具。 |

2、<u>本协议目录和各条文的标题内容仅为了方便而加入，并不具有法律效力，亦不影响本协议的任何条款的解释。</u>

3、<u>模具、样品</u>

3.1  模具开发费用：依照产品设计图纸/修改图纸要求，在需要新

(合作协议书  2000 年 10 月 19 日)　　　　　2

开模具或重大修改时产生的模具费用，由甲、乙双方根据模具的成本确定模具费用，在乙方要求甲方支付时，甲方予以支付；

3.2 模具费用的抵扣：如果甲方在乙方样品试验过程中和交付样品后，不再做重大修改，且甲方对该产品的采购量达到 3000 套（包括 3000 套）后，甲方不需要支付模具费用；若甲方已支付，则由乙方退回或在货款中抵扣，若甲方采购量不足 3000 套，则乙方不与退还模具费。

3.3 样品的交付：乙方依甲方实际工作需要在双方约定的时间内交付。

### 4、工业产权及商业秘密保护

4.1 A 类产品、B 类产品因设计、样品试制、生产所形成的工业产权及专有技术等商业秘密属甲方所有，未经甲方许可，乙方不得私自使用、许可他人使用或予以披露等；

4.2 C 类产品所形成的工业产权及专有技术等商业秘密属乙方所有，未经乙方许可，甲方不得私自使用、许可他人使用或予以披露等；

4.3 甲、乙双方因违反 4.1、4.2 之约定，由违反方承担全部法律责任，并赔偿因此而造成对方的一切损失；

4.4 针对特殊产品之工业产权及商业秘密，由甲、乙双方另行协商。

### 5、商　　标

依销售需求，由甲方指定乙方生产的相应产品使用某一商标，在具体订单、购销合约中予以明确；甲方每一商标之单件定量一年内需达到 5000 件，因商标引起的一切争议和法律责任均由甲方负责。

### 6、认　　证

为了符合美国、加拿大市场要求及为了更好地开拓美国、加拿大市

(合作协议书　2000 年 10 月 19 日)　　　　　　3

场，对产品生产商及产品的各项认证，甲、乙双方约定应在双方认可的时间内取得，如未取得，而导致产品销售未达预期效果，由责任方负责。

### 7、生产及销售

7.1 A 类产品、B 类产品由甲方根据市场需要，向乙方下达订货数量，采取委托生产、采购的方式；

未经甲方许可，乙方不得私自生产、自行或委托第三人销售或接受第三人委托生产。

7.2 C 类产品由甲方根据市场需要，向乙方下达订货数量，予以采购。在美国、加拿大市场乙方 C 类所有产品由甲方独家销售（独占性），乙方不得许可第三人或自行在美国、加拿大市场销售。

### 8、特别约定

8.1 本协议生效后，乙方不得再与任何第三方签署许可其在美国、加拿大市场销售本协议约定之 A 类产品、B 类产品、C 类产品；

8.2 甲方保证本协议生效后，从交货日期开始后一年内，甲方向乙方的采购量达到 USD300 万元，达到该采购量后，甲方在美国、加拿大市场的独家销售权自动延续，次年之采购量再另行协议；如未达到该采购量，甲、乙双方根据市场情况，另行商定。

8.3 8 个月内如甲方仍不能实行采购行为，本协议失效；

### 9、采　　购

9.1 产品价款及支付

甲方按照产品代码向乙方询价，乙方报价，由甲、乙双方协商确定。产品价款支付由甲、乙双方在订单或采购合约中约定。

9.2 产品质量

乙方生产之产品应符合美国 ANSI、加拿大 CSA 之要求，具体在甲

(合作协议书　2000 年 10 月 19 日)　　　　4

方订单或采购合约中约定。

如乙方生产之产品不符合 ANSI、CSA 之要求，依双方认可之公证机关出具的证明和数量，依据实际情况和金额进行赔偿。

甲方发现产品质量问题后应向乙方提出异议，乙方应在收到异议书后，三十天内予以答复，否则视为默认。佐证资料由双方另行协商。

9.3   产品数量及损耗

乙方应当以适当包装材料及装柜方式确保降低运输之破损，破损发生时，保险 5%免赔以内的，由双方商议解决，5%免赔率以外的由甲方向保险公司索赔；事前未通知甲方并得到同意的短装部分，在甲方提供有效见证的情况下，由乙方负责全部补足，且赔偿甲方或客户运费、税金和相关处理手续之损失。

9.4   交货期

甲方视乙方的生产状况下达订单或采购合约，双方共同确认交货期，乙方保证按期交货。如逾期 14 天甲方有权每逾期一日处以乙方总价之 5‰违约金；当逾期 21 日，除乙方支付甲方违约金外，甲方有权单方终止该订单或采购合约。在不可抗力情况下，导致延期交货，乙方应在不可抗力发生 3 日内通知甲方，协商延长交货期限。

乙方在按期完成生产后，甲方应按期，按量履行合同，如甲方需减量或推迟交货期，应提前 2 个月通知乙方。

9.5   订单及采购合约

甲方根据美国、加拿大市场情况，向乙方下达订单，由乙方确认，或由甲、乙双方签订采购合约，乙方负责订单或采购合约生产。

### 10、文件、送达、联络人

10.1 甲、乙双方约定，在执行本协议过程中，一切文件均采取书面形式，包括：信函、传真、电子邮件。

10.2 甲、乙双方约定，在执行本协议过程中，一切文件按照以下途径送达：

甲方：美商富凯股份有限公司台北分公司
地址：台北市长安东路一段 39-2 号
电话：886-2-2537 1374
传真：886-2-2568 3874

(合作协议书   2000 年 10 月 19 日)           5

电子信箱：michaelc@mail.fittpo.com.tw

乙方：唐山惠达陶瓷（集团）股份有限公司
地址：河北省丰南市黄各庄镇
电话：+86-315 8522741 8523618
传真：+86-315 8522827
电子信箱：huida@public.tsptt.he.cn

10.3 甲、乙双方约定，在执行本协议过程中，分别指定陈平/何可岚先生/女士为甲方联络人；王彦庆、邢锦荣先生/女士为乙方联络人。

## 11、整体性

本协议及双方在履行本协议过程中，所形成的设计图纸、修改图纸、订单、采购合约等文件均为本协议一部分，具有同等法律效力。

## 12、法律适用

本协议的订立、解释、生效、履行以及争议的解决均适用中华人民共和国法律。

## 13、纠纷的解决

甲、乙双方在履行本协议过程中出现纠纷，应通过协商解决，如仍不能解决，甲、乙双方一致同意提交中国国际经济贸易仲裁委员会深圳分会仲裁。

## 14、变更、解除

未经甲、乙双方协商一致或出现法定变更解除事宜，本协议不得单方变更、解除。

## 15、生　　效

（合作协议书　2000年10月19日）　　　　6

本协议自甲、乙双方签字后生效。

### 16、法律效力

本协议一式肆份，甲、乙双方各执两份，具同等法律效力。

美商富凯股份有限公司

代　表：陈亮祖．　　　　　　　　[signature: Jle Chen]

二〇〇〇年十月二十 日

唐山惠达陶瓷（集团）股份有限公司

代　表：[signature]

二〇〇〇年十月二十 日